FILED UNDER SEAL

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| H. KENNETH LEFOLDT, JR., AS TRUSTEE OF THE WHISTLER ENERGY II, LLC LITIGATION TRUST, | : : : : | CIVIL ACTION NO.: |
| Plaintiff, | : : | |
| VERSUS | : : | SECTION: 18-5303 |
| SCOTT A. FRANKEL, | : : | |
| Defendant. | : | SECT. A MAG. 1 |

...........................................................................................................

## COMPLAINT FOR BREACH OF FIDUCIARY DUTIES

NOW INTO COURT, through undersigned counsel, comes Plaintiff, H. Kenneth Lefoldt, Jr., ("Plaintiff" or the "Trustee"), in his capacity as Trustee of the Whistler Energy II, LLC Litigation Trust created in connection with the plan of reorganization confirmed by the United States Bankruptcy Court for the Eastern District of Louisiana in the case bearing the caption *In re Whistler Energy II, LLC*, No. 16-10661 (the "Bankruptcy Case"), and files this Complaint for Breach of Fiduciary Duties ("Complaint") against Defendant, Scott A. Frankel ("Defendant" or "Frankel"). In support of this Complaint, the Trustee respectfully states as follows:

## NATURE OF THE COMPLAINT

1.      In the oil exploration and production ("E&P") industry, conditions change rapidly and variables abound, and an initial plan of development may no longer be realistic as facts on (or under) the ground change and new information comes to light. A competent E&P executive must continually re-assess the current state of the company's operations and finances, and adapt its drilling, development, and production strategy accordingly.

1

2.     Crucially, this "one-size-fits-all" analysis does not work for E&P companies such as Whistler, as such companies have different capital structures and abilities withstand risk.  For example, a large company with a ready supply of available cash and an expansive portfolio of leases will approach an exploration plan in a fundamentally different manner than will a small, privately owned start-up that has limited cash and holds only a single lease capable of producing income.

3.     For those reasons, it is imperative that executives make informed decisions that consider all material information available to them, as well as the risks inherent in a particular course of action, and that they do so in light of their unique capital structure.  It is equally—if not more—important that executives revisit such previously "informed decisions" as new information comes to light.  **This Complaint describes what happens when an executive with inadequate experience and unfettered autonomy over a company's strategic direction fails to do so.**

4.     Frankel, a medical doctor by trade, learned in 2011 that ExxonMobil ("Exxon") was looking to sell a dormant platform and to assign associated mineral leases in the Green Canyon 18 and Ewing Banks 988 fields located on the Outer Continental Shelf ("OCS") in the Gulf of Mexico.  Frankel formed Whistler Energy II, LLC ("Whistler") in 2012 to pursue the purchase, installing himself as Whistler's Chairman and Chief Executive Officer.

5.     Having limited E&P experience consisting largely of passive investments in non-operating interests made with his personal funds, Frankel assembled a technical team of professionals to manage Whistler's operations: Robert Wichert as Chief Operating Officer, Bob Bethancourt as Reservoir Engineering Manager, Tom Englehart as Geoscience Manager, and Curtis Carver as Chief Financial Officer.

6.     Frankel then endeavored to obtain funding that would enable Whistler to purchase the Exxon assets.  By summer 2013, Whistler had lined up equity investments and a credit facility totaling $90 million, which it used to purchase the platform and assume the leases on the OCS about 150 miles off the Louisiana coast.

7.     The documents memorializing the equity and credit agreements were executed in July 2013.  As part of the closing package, an "Approved Plan of Development" ("APOD") was created that detailed Whistler's planned operations over the next several years.  The APOD envisioned a sequential development strategy that would begin with certain required platform refurbishments before proceeding with a series of workovers, recompletions, and certain other small-scale operations intended to increase production from existing wells on the platform. Similar to the "priming" of a pump, the initial capital contribution from Whistler's equity and lenders was intended to fund these early operations to increase the platform's incremental production rate, i.e. an estimated number of barrels of oil per day, and in turn provide near-immediate liquidity that would fund Whistler's four anticipated large-scale drilling projects.  As Whistler's supermajority equity holder, Commerce Oil, LLC ("Commerce"), put it, "the prime directive is to maximize production at minimal cost as quickly as possible."  The APOD was created with this objective in mind.

8.     Although Frankel had assembled a team with technical and geological experience, he isolated those individuals from all things pertaining to Whistler's finances.   His team thus worked in a vacuum, conceptualizing, and implementing plans without any real understanding of Whistler's ability to pay for them.  Instead, Frankel exercised sole control over Whistler's financial and strategic direction without input from Whistler's operational team, and alone determined Whistler's next projects, the timing for those projects, and how Whistler would fund each project.

3

9.      Frankel was totally out of his depth and, as a result, the budget and existing funding for the APOD balanced on a razor's edge, with virtually no room for cost overruns, unanticipated drilling difficulties, disappointing production, or any of the other uncertainties or risks that every competent E&P executive knows to exist and plans for accordingly. Frankel was well aware that those issues had previously impacted Exxon's attempts to develop the assets. Prior to the purchase, Exxon had given Frankel data showing that prior wells it had drilled had experienced significant overruns due to, *inter alia*, lost returns based on drawdown sands, and further stating that 70% of Exxon's relevant completions had failed within the first 10 months.

10.     Frankel's ill-conceived "silo" strategy, by which he excluded his technical team and vested himself—possessing virtually no technical or geological knowledge—with sole control over Whistler's strategic direction and capital expenditures, was thus doomed from the start.

11.     The phase one/platform refurbishment effort was supposed to take only a few months. However, Frankel seriously underestimated the platform refurbishment risks. That effort ran both over time and over budget. Indeed, by October 2013, expenditures allocable to the platform refurbishment effort had already increased by $3.1 million, representing nearly one-third of Whistler's then-available cash intended to pay for the second-phase workover/recompletion projects on existing wells.

12.     The second phase of the APOD, the workover/recompletion efforts on existing wells, did not generate anywhere near the production that Frankel had counted on. The production assumptions that he communicated to stakeholders—and upon which funding for Whistler's future projects depended—were unduly optimistic, far in excess of those that the independent consulting firm hired by Whistler, Ryder Scott, estimated and that Exxon had achieved during its tenure as

operator. Unsurprisingly, Frankel's production assumptions were soon proved to be grossly unrealistic.

13.     That lack of production or "rate failure" had a significant negative impact on Whistler's liquidity—resulting in a shortfall of between $80 and $95 million dollars for the period between September 2013 and October 2014. That shortfall represented the funding that was supposed to be available to pursue the large-scale drilling projects.

14.     Because Whistler's APOD had been structured such that the viability of the next sequential project was dependent upon the success of the ones prior, the cost and rate failures described above had a "domino effect," whereby Whistler found itself without adequate capital to fund the contemplated "large scale" drilling projects (collectively, the "PUD Projects").

15.     The standard approach to vetting capital expenditures in the E&P industry is for the reservoir engineering personnel (*i.e.*, those who evaluate where the hydrocarbons are located) to coordinate with the technical team (*i.e.*, those who conceptualize how, and when, a well will be drilled) and the commercial/business side to determine together a strategy that aligns the company's potential mineral resources with its technical and financial capabilities.

16.     Frankel's isolationist management style did not allow that to happen. In fact, Whistler never held a single board meeting during his tenure. Instead, Frankel continued to exercise complete and sole decision making authority over what Whistler would do, and when, and he made those decisions without consulting with his technical team and in a manner that diverged wildly from industry-standard practices.

17.     Instead of positioning Whistler to create value for its equity, as the APOD had envisioned, Frankel relied upon his equity holders and debt holders to create value for Whistler. He spent their money freely, with no regard for Whistler's failures along the way, simply assuming

5

that Whistler's equity would contribute more capital, or that its lenders would advance more money, despite none of them having the obligation to do so.

18.     Consistent therewith, after Whistler's production failures had pushed it into a nearly $100 million funding shortfall by late 2014, Frankel turned to his stakeholders to fund the drilling and completion of Whistler's first large-scale project, the Eupheme Well. Whistler's lenders agreed to provide Whistler with approximately $45 million.

19.     But Frankel's unwillingness (or inability) to assess meaningfully the geological and technical information Whistler had learned during the prior recompletion/workover efforts caused him to grossly underestimate the time and costs of drilling and completing the Eupheme Well.

20.     Further compounding the problem, Frankel opted to complete the Eupheme Well as a riskier, more expensive "dual completion" across multiple zones instead of pursuing a single completion in one zone. If those zones proved to be productive, this would allow Whistler's lenders to "book" additional mineral reserves that increased the value of the asset securing their loans.

21.     The choice to proceed with the dual completion did virtually nothing to address Whistler's short-term liquidity crisis; rather, that choice further exposed Whistler to increased risk and cost that it was not positioned to absorb. The end result was that the Eupheme Well project ran an astonishing $28 million or more over budget, took several months longer than anticipated to complete, and did not generate production anywhere close to Whistler's initial estimates. Frankel failed to keep Whistler's stakeholders completely apprised of these issues as they became known, selectively providing only snippets of information as he deemed fit while repeatedly coming to them "hat in hand" to ask for additional funds along the way. Ultimately, the lenders loaned to Whistler another $31.5 million in addition to the $45 million that had already been loaned.

6

22.     The Eupheme Well was finally completed in October 2015, but it produced only a fraction of what Frankel had assumed and what Whistler needed to execute upon the contemplated development strategy and APOD.

23.     Due to the structure of Whistler's APOD, the "Eupheme disaster," as Whistler's supermajority equity holder termed it, meant that—yet again—no funding existed for Whistler's next PUD Project.  Whistler did not even have sufficient funds to pay the vendors/trade creditors who worked on the Eupheme Well.

24.     Against that backdrop, Whistler's supermajority equity holder indicated it would not contribute any additional money to Whistler.  Whistler's credit facility was likewise maxed out.  Collectively, Whistler's equity and lenders had contributed more than $200 million in capital by November 2015, all of which Frankel had burned through.

25.     Although Whistler was supposed to be self-funding at that point through its ostensibly increased production, in reality, Whistler's production levels were just enough to "keep the lights on," and its available cash after completing the Eupheme Well had dwindled to around $325,000.  In fact, during this period, Frankel himself was openly discussing the possibility of taking Whistler into voluntary bankruptcy.

26.     Nevertheless, Frankel blindly adhered to the existing APOD, which called for Whistler to move on to the next PUD Project immediately after the Eupheme Well was completed. **Despite the fact that Whistler had no money and no funding commitment, Frankel, over equity's objection, recklessly plunged Whistler headlong into drilling the next well—the "Erato Well—which it "spud" (*i.e.*, commenced drilling) on November 23, 2015.**

27.     Drilling the Erato Well cost more than $250,000 per day, which Whistler (having no cash, no funding commitment, and thus no way to pay for the Erato Well to be drilled, let alone

7

completed) funded through an "involuntary trade creditor" financing model that forced service providers to work for months or more at a time without payment, until such time as the Erato Well would, in theory, start producing.

28.     While drilling on Erato Well proceeded, Frankel worked behind the scenes to obtain stopgap funding that could help Whistler pay for at least part of it. To that end, Whistler's largest lender, Apollo,[1] had indicated it would consider injecting nearly $20 million of immediate capital as part of an "out-of-court" restructuring, whereby Apollo would take over as controlling equity. Frankel would personally receive a $1.1 million payment from the outgoing supermajority equity holder as part of this transaction.

29.     The parties negotiated the proposed restructuring transaction over the next five weeks, while drilling on the Erato Well continued unabated and trade debt continued to accrue.

30.     Whistler and Apollo signed documents on December 29, 2015 whereby, *inter alia*, Apollo committed to provide $19.6 million in immediate funding that Whistler could use toward the drilling and completion of the Erato Well.

31.     But a small oil sheen appeared on the water near the Whistler platform soon after closing, causing a temporary break in drilling efforts that lasted just over a week. On that basis, Apollo decided to delay its funding until an undetermined later date.

32.     Although Frankel obtained an opinion from Whistler's attorney concluding that Apollo was obligated to fund the $19.6 million immediately (money that Whistler sorely needed), Frankel, for reasons known only to him, made no effort whatsoever to compel Apollo to pay the money.

---

[1] "Apollo" is a number of affiliated entities that included Apollo Franklin Partnership, L.P., Apollo Centre Street Partnership, L.P., Apollo Special Opportunities Managed Account, L.P., Apollo Credit Opportunity Fund III AIV I LP, and ANS Holdings (WE), Ltd.

33.     In early January 2016, Frankel formally advised Apollo that he would not pursue the issue further.

34.     Faced with no way to pay for the drilling and completion of the Erato Well—a well that he should not have spud to begin with in light of Whistler's utter lack of liquidity—Frankel began to "unwind" Whistler's in-the-money crude hedges (styled as "swap agreements")—which were obtained by Whistler to, *inter alia*, protect Whistler against price fluctuations while providing a certain revenue stream that would help fund its future operations—at a decreased value.

35.     Akin to turning a garden hose on a forest fire, this generated "sprinkle money" that allowed him to pay certain critical vendors a few dollars at a time. Frankel adopted this strategy reflexively, without any analysis of the short—or long—term effects on Whistler's capitalization (which, again, was dependent upon continual influxes of cash from production on a going-forward basis), and without the knowledge or approval of Whistler's equity holders.

36.     Eventually the house of cards came tumbling down. After a tragic accident in which a third-party vendor's employee was killed on the platform, the entire platform was shut-in by the Bureau of Safety and Environmental Enforcement ("BSEE"), meaning that all drilling, including the Erato Well, was immediately shut down. Trade creditors, frustrated with months' worth of unpaid bills without any meaningful prospect of payment, elected to put Whistler into an involuntary bankruptcy proceeding.

37.     Soon thereafter, Whistler terminated Frankel's employment "for cause," focusing, *inter alia*, on his persistent inability to model Whistler's budgets or production levels accurately, along with his gross mismanagement of Whistler and its finances.

## THE PARTIES

38.     The Plaintiff is H. Kenneth Lefoldt, Jr., an individual domiciled in the State of Mississippi who brings this suit in his capacity as Trustee of the Whistler Energy II, LLC Litigation Trust created under the plan of reorganization confirmed on January 25, 2017 [Bankr. No. 16-10661, ECF Doc. 552].

39.     Defendant herein is Scott A. Frankel, an individual who, upon information and belief, is domiciled in Bellaire, Texas.

## JURISDICTION AND VENUE

40.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332, as the Plaintiff is a citizen of Mississippi, the Defendant is a citizen of the State of Texas, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

41.     This Court also has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b), as this proceeding is related to the Bankruptcy Case and the plan of reorganization confirmed therein.

42.     This Court may exercise personal jurisdiction over Frankel. Whistler's platform is located off the Louisiana coast and Frankel routinely conducted significant business in the State of Louisiana.  Frankel is also subject to personal jurisdiction in this Court by virtue of his continuous and systematic contacts with the State of Louisiana through other activities that include, but are not limited to, volunteering for and subsequently receiving an appointment to serve as a trustee (through an alter-ego limited liability company of which Frankel is the sole member) of a trust created to manage, develop, and ultimately liquidate oil and gas assets in the State of Louisiana.  Separate and apart from the foregoing, upon information and belief, Frankel also owns (or owned) non-operating interests in various oil and gas leases in the State of Louisiana.

43.     Venue in this Court is proper pursuant to 28 U.S.C. §§ 1391(b)(2) and 1409.

## PROCEDURAL BACKGROUND

44.     On March 24, 2016, Romfor Supply Company d/b/a Premiere Fluids International, Adriatic Marine, L.L.C., Hydra Ops, LLC, Scientific Drilling International, Inc., and Patterson Services, Inc. d/b/a Patterson Rental Tools commenced the Bankruptcy Case by filing an involuntary petition for relief under the Bankruptcy Code.

45.     On May 25, 2016, the Order for Relief was entered.  [Bankr. No. 16-10661, ECF Doc. 59].

46.     On October 29, 2016, the Debtor and other plan proponents submitted a *Jointly Proposed Chapter 11 Plan of Reorganization* (the "Plan").  [Bankr. No. 16-10661, ECF Doc. 529].

47.     Pursuant to Article VIII of the Plan, the "Litigation Trust Assets" include "all potential Causes of Action held by the Debtor and Debtor-in-Possession against the Debtor's former Chief Executive Officer and member of the Board of Managers, Scott A. Frankel."  The Plan transferred and assigned the Litigation Trust Assets to the Litigation Trust, and appointed Plaintiff to serve as the Trustee for the Litigation Trust.  The Plaintiff as Trustee is authorized and has standing, among other things, to prosecute, settle, dismiss, abandon, or otherwise dispose of "Causes of Action," including the matters at issue in this Complaint.

48.     On January 25, 2017 the Bankruptcy Court entered an Order confirming the Plan. [Bankr. No. 16-10661, ECF No. 552].  The effective date of the Plan occurred on May 25, 2017. [Bankr. No. 16-10661, ECF Doc. 612].

49.     In accordance with the Plan, the Litigation Trust was established as of the Effective Date, and the Reorganized Debtor and the Trustee entered into that certain "Litigation Trust Agreement."

11

50.     Pursuant to Article VIII, Section H, of the Plan, and Article IV of the Litigation Trust Agreement, the Trustee is thus the proper party in interest to bring the causes of action asserted herein.

## FACTUAL BACKGROUND

**I.      Background: Whistler's Formation and Capital Structure**

51.     In 2011, Frankel, a medical doctor with virtually no oil and gas exploration experience, learned of an opportunity to purchase an offshore drilling platform and assume leases to explore and produce hydrocarbons from two blocks of producing properties on the OCS (the "Asset"). Although the Asset was producing measurable amounts of oil, its majority owner at the time, Exxon, had ceased virtually all capital expenditures on the project in or around the year 2000 to focus on larger-scale projects. As a result, production had fallen off nearly 96% from its peak.

52.     Frankel believed that there was an opportunity to increase the existing production from the approximately 1,350 barrels of oil per day ("BOPD") the Asset was producing in late 2012, up to 20,000 BOPD or more by the end of the year 2014. Although the opportunity was possibly a lucrative one, it required a significant influx of capital on the front end. Plug-and-abandonment funding liabilities alone were in the neighborhood of $70 million, separate and apart from the $40 million purchase price for the Asset itself.

53.     Frankel personally did not have access to the kind of capital needed for this investment, so he formed a limited liability company, Whistler—named after one of his favorite ski resorts—to pursue the prospect. He installed himself as Chief Executive Officer, hired four individuals to serve as Whistler's technical/operational personnel: Robert Wichert ("Wichert") as Chief Operating Officer ("COO"), Bob Bethancourt as Reservoir Engineering Manager, Tom

Englehart as Geoscience Manager, and Curtis Carver as Chief Financial Officer). He then embarked upon an effort to attract funding partners.

54.     Although an earlier funding effort fell apart, by Spring 2013, Frankel had tentatively agreed to terms with Commerce, a Connecticut-based private equity fund, to make a capital contribution in the amount of $20 million in exchange for 38.25 Preferred Units of Whistler, thus making Commerce the supermajority equity holder. The deal was finalized on July 11, 2013, when Whistler amended its existing LLC agreement to memorialize the new structure (the "2013 Whistler LLC Agreement").

55.     The 2013 Whistler LLC Agreement also reflected capital contributions in the amount of $100,000, each, by Frankel and Black Star Energy, LLC (whose principal, Robert Wichert, was Whistler's COO), in exchange for a minority interest consisting of vested and unvested common units.

56.     The remainder of the initial capital was lent to Whistler by Apollo and certain Summit Partners entities[2] (collectively, "Summit") in the amounts of $54 million and $36 million, respectively. Those commitments were memorialized in a separate Note Purchase Agreement also dated July 11, 2013 (the "NPA"). In connection with that NPA, Apollo and Summit were granted first-lien rights on virtually all of Whistler's assets,[3] and, consistent therewith implemented a series of restrictions upon Whistler's access to liquidity. Those requirements included that Whistler (i) maintain certain swap agreements hedging designated percentages of its reasonably anticipated

---

[2] Those entities included: Summit Partners Credit Fund, L.P., Summit Partners Credit Fund A-1, L.P., Summit Investors I, LLC, and Summit Investors I (UK), LP.

[3] Additionally, the 2013 LLC Agreement awarded Apollo and Summit vested warrants to purchase an aggregate of 38.25 Common Units of Whistler.

production, and (ii) set aside funds in a capital reserve account accessible only for specified purposes or with the approval of the lenders.

57.     On March 11, 2014, Commerce entered into an agreement to purchase certain of Frankel's individual units in Whistler, including all of his vested and certain of his time- and performance-based unvested units to the extent they ultimately became vested, for the total purchase price of $17 million.

## II.     Governance

58.     The 2013 Whistler LLC Agreement created a three-person Board of Managers, comprised of two individuals appointed by Whistler's management and one individual appointed by Commerce, the supermajority equity holder.  The two management appointees were Frankel and Wichert, while Tom Kalb served as the Commerce appointee.

59.     Whistler was formed as a Delaware limited liability company.  Under Section 6.8 of the 2013 Whistler LLC Agreement, Frankel and Wichert, as "Management Members," owed "Whistler and the Members the same fiduciary duties as a director of a corporation governed by Delaware law."

60.     Although the 2013 Whistler LLC Agreement contains a provision eliminating the fiduciary duties otherwise owed by its "Investor Managers" (*i.e.*, Kalb) to the extent permitted under the Delaware Limited Liability Company Act, there is no similar exculpatory provision applicable to Management Members such as Frankel.

61.     Frankel remained in place as Whistler's CEO.  Section 6.10 of the 2013 Whistler LLC Agreement pertaining to "Officers" provides that "the assignment of such title shall constitute the delegation to such officer of the authority and duties that are normally associated with that office."

14

62.     Section 6.5 of the 2013 Whistler LLC Agreement required Whistler to hold quarterly meetings, though in practice those meetings were never held. Rather, Frankel maintained near-unfettered autonomy to make strategic decisions as he saw fit.

### III.     Plan of Development

63.     The 2013 Whistler LLC Agreement and NPA included the APOD, which identified a number of capital expenditures intended to develop the Asset.

64.     The APOD contemplated a sequential development strategy that would begin with certain required platform refurbishments before moving on to a series of workovers, recompletions, and other small-scale projects intended to revitalize the platform's existing wells in an effort to increase their daily production rates.

65.     Those refurbishments and the ensuing "small-scale" projects to follow were together intended to generate liquidity that would be used to fund the drilling of four or more new wells that Whistler believed would allow it to recover various proved undeveloped reserves ("PUDs") believed accessible via its mineral leases. Pursuant to the 2013 Whistler LLC Agreement and NPA, those new wells—referred to by their anticipated drilling order—were Terpsichore ("PUD1"), Polymnia ("PUD2"), Erato ("PUD3"), and Euterpe ("PUD4").

66.     The APOD premised the funding for the drilling and completion of those four PUDs on the assumption that the recompletion and workover efforts would increase production from the current level of around 1,300 BOPD to approximately 4,800 BOPD by the end of 2013, and 7,300 BOPD by mid-2014. That increased production would, in turn, generate immediate liquidity that would be used to fund the drilling and completion of PUD1, which, if successful, would, in turn, fund the drilling and completion of PUD2, and so on. If any phase of APOD were not successful, then the next phase could not be funded.

67.    Frankel was responsible for creating the APOD.  Lacking experience and desiring to impress his stakeholders, he included rock-bottom cost estimates that, contrary to industry standard, failed to account for known and unknown risks.  Many of those risks were communicated directly to Frankel by Exxon prior to the sale of the Asset.  Because Frankel's lack of experience left him ill-equipped to understand such risks, the APOD's funding was thus balanced on a razor's edge, with no room for delays, cost overruns or other uncertainties.

68.    Frankel also premised the APOD on sky-high production assumptions that were several times higher than those provided by Whistler's third party consultant, Ryder Scott, and were also belied by data from Exxon's tenure as operator indicating that only 2 of the 40 wells Exxon had drilled had ever achieved the rates Frankel counted upon.

69.    By late July 2013, Whistler was in possession of information showing that, contrary to the APOD model, Whistler would not have sufficient funding to drill PUD1.

70.    In what would become a consistent pattern of disregard, Frankel paid no mind to those shortfalls because, at least with respect to PUD1, in the event the increased production obtained through the workover and recompletion phase was insufficient to fund the drilling and completion of PUD1, the first large-scale drilling project, Section 4.5 of the 2013 Whistler LLC Agreement obligated Commerce to fund the amount necessary to drill and complete the well.[4]

71.    Whistler took control of the Asset from Exxon on September 4, 2013, and was able to physically inspect the Asset for the first time on that date.

---

[4] Commerce's funding obligation was triggered upon the occurrence of a "PUD 1 Funding Deficit" (defined generally as the delta between (i) the costs to drill/complete the well and (ii) Whistler's available cash-on-hand.  Thereafter, Commerce would have the right, but not the obligation, to fund the three remaining PUD Projects.  In the event Commerce opted not to fund any of those remaining PUD Projects, Commerce's equity interest would be transferred to the then-existing warrant holders (*i.e.*, Apollo and Summit) for the price of $1.

72.     Almost immediately thereafter, the amount that the APOD allocated to the platform refurbishment effort was increased by more than $3 million, which represented nearly one-third of Whistler's then-available cash intended to cover the forthcoming workover and recompletion projects.

73.     The workover and recompletion projects on existing wells likewise ran into difficulties.  By November 2013, daily production had actually **decreased**, down to 1,000 BOPD. That level of production was markedly lower than what Frankel had assumed and relied upon in structuring the APOD, giving rise to an immediate funding shortfall that jeopardized the success of Whistler's future PUD Projects.

74.     Frankel failed to heed the warning signs indicating that the workover and recompletions were not going to achieve the level of success he had assumed.  Indeed, he actually **increased** the anticipated production rate in his updated forecasts, now forecasting that 9,300 BOPD would be realized through the workover program by the time PUD1 was ready to be drilled.

75.     In early 2014, Whistler executed a contract with Nabors Drilling Corporation ("Nabors") to install a drilling rig on the platform.

76.     Notably, Frankel did not allow Whistler's COO, Wichert—an individual with more than 35 years of technical and managerial experience in upstream petroleum engineering operations including drilling and completions—to participate in the negotiation of that contract. Rather, Frankel negotiated the terms of the Nabors contract himself and, either out of ignorance or willful disregard for the fact that Whistler had, at most, a funding commitment for a single well, committed Whistler to a "two drill" contract that would require it to pay a substantial penalty in the event it did not utilize the Nabors rig to drill a second well.

17

77.     In April 2014, Frankel finally provided an updated, realistic production forecast reflecting that production from the existing wells would be only 1,700 BOPD by December 2014. That meant that Whistler would run out of money in early 2015—before any production from the anticipated PUD drilling program would ever be realized.

78.     On that basis, Frankel revised his APOD to designate the Eupheme Well as Whistler's first large-scale drilling project, replacing Terpsichore as "PUD1." Frankel believed that the Eupheme Well could be completed more quickly and for less money than other contemplated PUD Projects, and would further generate an immediate production boost to offset the shortfalls realized thorough the disappointing workover and recompletion projects. That decision required lender approval, as Eupheme was not one of the four PUDs identified in the NPA.

79.     Around the same time, Frankel decided that the Erato Well would replace Polymnia as "PUD2," Whistler's second large-scale drilling project, to be commenced as soon as the Nabors rig could be moved off of the Eupheme Well.

80.     In addition to obtaining lender approval prior to drilling the Eupheme Well, Frankel also needed to find a way to pay for it, as the shortfall in production income (*i.e.*, the difference between what the original APOD had originally forecast and what was now expected to be realized by the end of 2014) was at least $80 million.

81.     In August 2014, Frankel updated Whistler's cash flow model and drilling schedules to reflect the above and provided them to Commerce, Apollo, and Summit. Frankel's initial estimate to drill and complete the Eupheme Well at that time was between $8 and $12 million.

82.     Recognizing that Whistler, on account of its production shortfalls, had no way to pay for the drilling of the Eupheme Well, Frankel sought an additional funding commitment prior to commencing the project. To that end, Apollo agreed to purchase the debt formerly held by

18

Summit, thus becoming the sole holder of Whistler's outstanding debt, and further agreed to extend additional credit in the amount of $45,788,034, thus bringing Whistler's total outstanding indebtedness to $125 million, all of which was now held by Apollo. The NPA was amended on October 17, 2014 (the "Amended NPA") to reflect the foregoing, and also to formally re-define the Eupheme Well as PUD1 and the Erato Well as PUD2 thereunder.

83.     But the prior structure under the 2013 Whistler LLC Agreement whereby Commerce was obligated to fund the entire cost to drill/complete any of the PUD Projects was eliminated under the Amended NPA. In other words, once the new money lent by Apollo ran out, Whistler's only guaranteed revenue stream to fund additional drilling efforts or otherwise would be based on its production rate, that is, the value of the BOPD that could be extracted from the Asset and sold.

84.     Cash forecasts generated around the time the NPA was amended suggested there was a very real possibility that Whistler would run out of cash if the Eupheme Well did not produce as expected.

85.     The APOD was also revised in December 2014 to reflect those changes to the PUD Projects.

**IV.     The Eupheme "Disaster"**

86.     Five different productive intervals, that is, sections of sand at various depths believed to contain hydrocarbons, were believed to be accessible through the Eupheme Well. These sands, listed in order of their relative depth, were the "18," "20/26," "30A," "30B," and "38."

87.     The primary target of the Eupheme Well was the 20/26 interval, believed to be capable of producing 4,000 BOPD or more alone.

88.     While Ryder Scott calculated the total potential recovery from the Eupheme Well at approximately 750,000 barrels of oil, Frankel believed—and his forecasts reflected—that the total reserve potential of the Eupheme Well was approximately 2.5 million barrels of oil or more. The difference was attributable to Frankel's inclusion of "exploratory" reserves potentially located in the 30A/30B and 38 sands.

89.     The Eupheme Well was originally intended as a simple sidetrack that would take less than a month to drill, at a cost of $8 to $12 million, and generate incremental production increases. But Whistler's lenders advocated behind the scenes for a riskier and more expensive "dual completion" that, if successful, would allow Whistler (and by extension, the lenders whose funds were secured by Whistler's assets) to "book" additional reserves. Although this was contrary to Whistler's interests—and its "prime directive" to maximize production at minimal cost— Frankel was swayed by the lenders and opted to complete the Eupheme Well across multiple intervals by utilizing a "sliding sleeve" that would allow Whistler to access the 20/26, 30A/30B, and 38 sands via the same production equipment. These latter intervals were "exploratory" and would be completed solely to increase possible reserve value.

90.     Although a "dual completion" was advantageous for Whistler's lenders, it would also cost millions more than the originally contemplated single completion. The decision to pursue the "dual completion" increased the estimated cost to drill and complete the Eupheme Well to approximately $16 million.

91.     Perhaps more importantly, the dual completion posed significant technical and economic risks that Whistler was not positioned financially to absorb.

92.     Drilling the Eupheme Well did not proceed as anticipated. Rather, it was a "disaster" from the start, quickly consuming all of the funding that Apollo had provided in October 2014.

93.     As early as April 2015, Commerce believed that the question was "not if" Whistler would run out of cash, "but when."

94.     By August 3, 2015, the costs associated with the Eupheme Well were already more than double the $16 million initially estimated and approved, and the Eupheme Well was still months away from producing hydrocarbons.

95.     Frankel was unperturbed, driven as always by his naïve assumption that Whistler's backers (Commerce and/or Apollo) would simply continue to give him more money, despite the fact that they had no obligation to do so.   Throughout the first three quarters of 2015, he kept delaying the Eupheme Well's anticipated production date a month or more while asking Whistler's equity holders and lenders for more money.

96.     Commerce begrudgingly obliged, giving Whistler $15 million in June 2015 and another $15 million in August 2015.   Those funds, however, were structured not as capital contributions, but as subordinated loans, signifying Commerce's unwillingness to make additional capital investments in Whistler.

97.     During Summer 2015 and into Fall, Commerce advised Whistler that it would not contribute any money toward the next PUD Project, the Erato Well.

98.     The Eupheme Well was finally put into production in October 2015.   In total, the Eupheme Well had cost more than $50 million (over three times the initial approved budget of $16 million) to drill and complete.

99.     Whistler counted on an increase in excess of 4,000 BOPD simply from the Eupheme Well's 20/26 interval, but it generated only a fraction of that volume.   The 38 interval failed completely.

100.    Although production from the 20/26 interval improved slightly over the coming weeks, by late November 2015, it was clear that the three intervals completed in the Eupheme Well would generate only a fraction of the production—and cash—that Whistler had anticipated and needed.

101.    The Eupheme Well was yet another production failure that ended up producing, in total, only around 1,000 BOPD.

102.    Whistler's APOD was premised upon the use of available cash generated first by increased production resulting from the workover/recompletion effort and then via the anticipated Eupheme Well production.  Because both of those projects failed to produce the anticipated production volumes, Whistler again found itself with no money for its next PUD Project, the Erato Well.

V.      **"On a Wing and a Prayer": Drilling the Erato Well**

103.    The Eupheme Well finally produced hydrocarbons in October 2015, several months after expected and at a cost of approximately $35 million or more over the amount budgeted.

104.    Using data compiled by a valuation firm, Stout Risius Ross, at year-end 2015, Whistler was balance-sheet insolvent as of October 31, 2015, if not earlier.  Whistler's enterprise value was under $100 million at that time, with liabilities of $140 million or more owed not only to Apollo and Commerce, but also to the various trade creditors it had mislead into unwittingly financing the Eupheme Well's completion on and who were still owed millions of dollars for their work on the disappointing well.

105.    By early November 2015, Whistler's trade creditors demanded payment—Whistler owed more than $13 million in payables after the completion of the Eupheme Well, of which nearly $10 million was more than 60 days overdue.  Those vendors publicly discussed pulling their

equipment and personnel from Whistler's platform, which would have been disastrous for Whistler's ability to pursue further PUD Projects.   On November 5, 2015, Commerce thus contributed an additional $1.5 million in subordinated debt in a last-ditch effort to help Whistler stay afloat.

106.    On top of its growing mountain of debt, Frankel estimated Whistler's next PUD Project, the Erato Well, to cost at least $26 million.  But that existing plan to drill immediately the 17,500 feet MD (Measured Depth) needed to complete the Erato Well was no longer feasible, or even rational, in light of Whistler's current financial condition, and in particular, the cost- and rate-failures that ensured Whistler could not generate the capital assumed by the APOD.

107.    Whistler had approximately $325,000 in available cash at the time, $13 million in overdue payables, and no funding commitment for future projects.  Frankel was aware of those shortfalls and thus knew that Whistler did not have the money to drill, let alone complete, the Erato Well.

108.    Whistler had been down this road before, after the platform refurbishment effort cost millions more than anticipated and the recompletions and workovers of existing wells failed to generate the production levels expected under the APOD in advance of the first PUD Project. At that time, Frankel had recognized Whistler's position and reacted, first by adjusting the APOD to move the Eupheme Well—with its supposedly cheaper price tag and expectation of immediate increased production—into the PUD1 position, and, more crucially, by obtaining a funding commitment from Whistler's lenders prior to beginning that project by executing the Amended NPA.

109.    But under the Amended NPA, neither Commerce nor Apollo had any obligation to provide funding for future PUD Projects, including the Erato Well.  Frankel, despite the fact that

23

he had signed both the 2013 Whistler LLC Agreement and the Amended NPA, was either not aware of that or chose to disregard it in favor of the assumption that, as always, that Whistler would be able to obtain the funds from its "deep pocket" stakeholders down the road as Whistler needed.

110.    Frustrated with Whistler's direction, in mid-November 2015, Commerce officially notified Frankel that it would not contribute any additional funds to Whistler.

111.    Apollo had previously made clear that it would not loan any more funds to Whistler beyond the $125 million it had already made available; indeed, as of November 2015, Whistler was unable to make the required interest payments on that debt.

112.    Frankel was unmoved by any of the foregoing. Although the APOD's funding model had failed, Frankel never undertook to assess that failure or other information gained to date, and, in particular, whether Whistler should continue down the road previously planned.

113.    Frankel never once convened a meeting of the Board of Managers, or met with the other members of senior management, to discuss whether Whistler should or could move on to the Erato Well immediately as had been planned.

114.    Indeed, Frankel—Whistler's Chairman—never held any meetings of the Board of Managers whatsoever, despite being required to hold quarterly meetings under the 2013 Whistler LLC Agreement.

115.    Behind the scenes, Apollo pressured Frankel to move forward to the Erato Well, which, if successful, would again result in an increase in booked "reserves" that would substantially increase the value of the Asset securing Apollo's note. Although that was certainly in Apollo's best interest, it was not compatible with Whistler's immediate liquidity needs, nor with the structure of its plan of development that was dependent upon production proceeds, not booking reserves. (Recall that Commerce's "prime directive" regarding Whistler's business model was to

"maximize production at minimal cost as quickly as possible.")  Frankel failed to recognize the distinction between Apollo's interests as a secured lender and those of Whistler, and/or to weigh Whistler's needs independently of those of Apollo.

116.    Had he cared to, Frankel could have updated Whistler's models to, at least, consider a number of smaller, less-expensive options available to Whistler that would have generated real, incremental increases in production and concomitant cash flow, which Whistler desperately needed by October 2015.  That analysis would have been consistent with Whistler's APOD that had been structured to fund PUD Projects in sequential order based upon the success of the prior project.

117.    One such option included keeping the Nabors drilling rig on the Eupheme Well and attempting to complete or otherwise stimulate production through the other intervals accessible through that Well.  This had already been approved through the APOD.

118.    An alternate option included recompleting another existing well, the A1, that appeared to be both promising and low risk, requiring only $1 to $2 million in costs and a couple of weeks to complete once work commenced.  Commerce, for one, expected that bringing that existing wellbore on-line would yield approximately 2,000 BOPD on its own—cash that could be "decisive" in terms of solidifying Whistler's long-term finances.

119.    Commerce suggested those options to Frankel numerous times throughout Fall 2015, including as late as November 8, 2015, but Frankel never seriously gave them any meaningful consideration, whether through modeling, forecasting, or even a simple discussion, and instead rushed right into drilling the Erato Well.

120.    Upon information and belief, Frankel's haste was influenced by the fact that the Nabors contract, which he solely negotiated, had committed Whistler to use Nabors' drilling rig to drill two wells; Whistler would have had to pay a substantial penalty if it failed to do so.

121.    Whatever the reason, at no point did he undertake a meaningful analysis of whether Whistler could actually afford to drill and complete the Erato Well in light of its precarious financial position, or whether it was in Whistler's best interest to delay drilling until a viable funding commitment materialized.

122.    Frankel did analyze, however, whether Whistler should enter into bankruptcy at this time.

123.    Apollo also considered what it termed an "out-of-court" restructuring.  To that end, in mid-November 2015, Apollo indicated that it was willing to consider the possibility of a restructuring transaction pursuant to which it would receive virtually all[5] of Commerce's equity in Whistler in exchange for an agreement to inject approximately $20 million worth of additional capital.  The interested parties, Whistler, Commerce, and Apollo, began discussing in earnest the terms of this "out-of-court" restructuring agreement.

124.    As part of the deal, Commerce suggested it would be willing to pay Frankel personally a significant sum—in excess of $1 million—to terminate Commerce's pre-existing contingent agreement to purchase Frankel's equity interest in Whistler.  Because that pre-existing agreement was conditioned upon achieving certain metrics that Whistler would otherwise not be able to satisfy, this was the only realistic opportunity Frankel would have to collect this payment from Commerce or otherwise monetize his own equity interest in Whistler.

---

[5] Commerce would retain a small percentage interest in any upside in the unlikely event Whistler's equity surpassed $125MM.

125.    For that reason, Frankel had no incentive to look for other, alternative sources of financing, opting instead to begin drilling the Erato Well while waiting for the restructuring deal, with its concomitant financing and his personal million-dollar payday, to come through at some point thereafter.

126.    Against that backdrop, Whistler spud the Erato Well on November 23, 2015.

## VI.    Paying for the Erato Well with "Sprinkle Money"

127.    Frankel intended to fund the drilling of the Erato Well using "involuntary trade creditor financing."

128.    Indeed, on November 24, 2015, the day after Whistler spud the Erato Well, Whistler received notice that certain critical vendors were planning to pull staff and equipment from the platform due to nonpayment.  Many of those vendors were owed significant, overdue sums of money from the Eupheme Well or other projects.

129.    Frankel insisted that he alone would deal with Whistler's trade creditors and, instead of telling them the truth, told them that full payment would be made in the "near future." He sought to bridge the gap by requesting Apollo to authorize the use of "sprinkle money" to pacify certain vendors clamoring for immediate payment in order to induce them (and mislead them) to vendor/credit finance the Erato Well.

130.    The majority of that "sprinkle money" came from prematurely "unwinding" Whistler's crude hedges, *i.e.,* allowing the counterparty to "buy out" those hedges that were currently in the money at a discounted rate.  Frankel directed those unwinds without analyzing or even considering the short- or long-term effect on Whistler's financial wherewithal, which, again, was premised on monthly influxes of cash from production.

131.   Frankel's "sprinkle" strategy was wholly ineffective.   The amounts that were "sprinkled" to vendors were minimal, representing a fraction of the total amount owed (an amount that increased every day).   His strategy of partially unwinding hedges simply destroyed future value.

132.   That knee-jerk response was ill-conceived and ineffectual, and by December 10, 2015, Whistler's total outstanding accounts payable ballooned to $27 million, of which $20 million was more than 120 days overdue, spanning back more than three months prior to the date the Erato Well was spud.

133.   All of that time, Apollo still deliberated whether to go forward with an in-court restructuring or the proposed out-of-court restructuring agreement.

134.   By mid-December 2015, after concluding that the costs and benefits associated with an "in-court" restructuring were generally no more or less favorable than the out-of-court option, Apollo represented to Frankel that it would go forward with the contemplated transaction whereby it would assume the vast majority of the equity currently held by Commerce in exchange for a $20 million capital contribution.   By then work on the Erato Well had been underway for more than three weeks, at a cost of $250,000 per day or more.

135.   Frankel informed Whistler's vendors that the Apollo payment was forthcoming, and those vendors continued their work on the Erato Well in reliance on Frankel's promise.   Soon thereafter, Frankel became aware that even the $20 million contribution expected from Apollo would be insufficient to drill and complete the Erato Well, as Whistler's prior representations to Apollo regarding how much cash would be needed to pay vendors had inadvertently omitted nearly $7 million of additional overdue payables (all more than 60 days aging or more).

136.     Over the next couple of weeks the "restructuring documents" that would effectuate the proposed $20 million transaction were negotiated and prepared by counsel.

137.     On December 29, 2015, the parties executed the documents and exchanged various e-mails confirming that their signatures were released and should be considered effective.  Apollo agreed to provide $19.6 million in immediate capital in exchange for Commerce's equity interest.

138.     But on that same day, BSEE shut down the platform due to the appearance of a small "sheen" in the water near the Whistler platform.

139.     Once Apollo learned of the shutdown, it opted to delay funding the $19.6 million it had agreed to fund.  Apollo did not invoke any *force majeure* or similar provisions that it contended would have suspended its obligations under the restructuring documents; it simply decided to hold funding in abeyance for some indeterminate amount of time.

140.     In January 2016, Frankel retained Whistler's outside counsel to evaluate the facts and circumstances surrounding the closing of the transaction.  That attorney, Mike Grove, issued a written opinion letter to Frankel asserting that the transaction had, in fact, closed and that Apollo was obligated to fund the $19.6 million immediately.

141.     Notwithstanding any of the above, Frankel never took any steps to compel Apollo to fund the $19.6 million. In fact, by the end of January 2016, Frankel advised Apollo that although he believed the restructuring deal was effective, he did not plan to pursue Apollo for the funds.

142.     Instead, Frankel once again—and without the knowledge, or consent, of Commerce—unilaterally reverted to his "alternate" funding strategy whereby he simply unwound more of Whistler's crude hedges to generate additional incremental "sprinkle money."  As before, unwinding these hedges resulted in a long-term, permanent loss of value to Whistler.

143.     Inevitably, the "house of cards" came tumbling down.  In mid-March 2016, a Nabors employee died in a tragic accident on the platform.  BSEE again shut down drilling operations on the Whistler platform.  That was the final straw for Whistler's creditors who, after months of being misled, not being paid, and now facing uncertainty as to whether the Erato Well they had been involuntarily financing would be further delayed, finally ran out of patience and put Whistler into an involuntary bankruptcy on March 24, 2016.

144.     On April 28, 2016, Whistler, during what appears to have been its first-ever board meeting, adopted a "termination resolution" stating that Frankel's employment was to be terminated for "Cause" on the basis of, *inter alia*, his persistent inability to model accurately Whistler's budgets or production levels, along with his gross mismanagement of Whistler's finances.  Frankel was fired for "Cause" that same day.

### Count 1:  Breach of the Duties of Care and Loyalty: the Erato Well

145.     Paragraphs 1-144 are hereby incorporated by reference as if set forth in full herein.

146.     At all relevant times herein, Frankel had *de facto* strategic and decision making control over Whistler.

147.     As Chairman and CEO of Whistler, Frankel was aware that the APOD (which he had prepared) was modeled on his assumption that Whistler's existing production would increase and, in turn, fund future drilling, completion, and production operations.

148.     The first "phase" of that increase in production was to come through Whistler's recompletion and workover programs on existing wells, which the original APOD had assumed would increase production levels from 1,300 BOPD in 2013 to 7,300 BOPD by the end of 2014.

149.     By April 2014, Frankel knew that the forecasts in the original APOD were grossly overstated, leaving Whistler with $90 million less cash than the APOD assumed it would have on hand.

150.     Completion of the Eupheme Well was intended to make up for that shortfall, but it too was a relative "disaster," generating only 1,500 BOPD—a fraction of what was anticipated—after it was put into production in October 2015.

151.     Separate and apart from its production failure, the Eupheme Well was also a cost failure.  The Eupheme Well had cost $50 million or more (3 times more than the initial authorization for expenditure), consuming not only all of the funds that Apollo had made available in connection with the Amended NPA in October 2014, but also an additional $31.5 million that Commerce lent to Whistler in an attempt to complete the Eupheme Well over the summer of 2015. Indeed, when the Eupheme Well was completed, Whistler still owed $13 million or more in overdue payables to vendors who had "involuntarily financed" the drilling and completion effort.

152.     Fed up with the foregoing, in November 2015, Commerce advised Frankel that it would not contribute any additional funds to Whistler, whether as a capital contribution, loan, or otherwise.

153.     Apollo's $125 million credit facility was maxed out, too.  Whistler was unable to make required interest payments on that debt by November 2015, and Apollo had accordingly notified Frankel that it was unwilling to loan any more funds to Whistler.

154.     At that time, Whistler had approximately $325,000 in available cash.

155.     By mid-November 2015, Whistler thus found itself with no cash, no funding commitments, $13 million or more in outstanding debt, and a failed production model.  Whistler's APOD was obsolete in light of those funding failures.  Frankel either ignored or failed to undertake

a meaningful (or any) analysis of those failures and simply rushed headlong into the Erato Well, blindly adhering to his unfeasible development plan that was proposed before those realities became known.

156.    Frankel's actions committed Whistler to a $26 million or more capital expenditure with no discernible means to pay for it.  This was contrary to standard decision-making processes in the E&P industry, which, at a minimum, require an authorized/approved funding plan prior to commencement of a large-scale capital expenditure.

157.    Frankel's decision to proceed with the Erato Well against that backdrop was contrary even to his own prior practices.  In 2014, after Whistler's recompletion and workover failures on existing wells had left it without sufficient cash to fund the drilling and completion of the "PUD1" Well, Frankel responded by revising the APOD to move the Eupheme Well into the first PUD position in an effort to increase immediate production.  He also sought, and received, a $45 million funding commitment from Apollo long prior to beginning work.  But in late 2015, faced with the same failures in advance of "PUD2," Frankel this time consciously ignored the red flags.

158.    Frankel failed to undertake any meaningful analysis as to whether Whistler's plan to drill the Erato Well in November 2015 was feasible.  He also failed to consider other, less costly projects proposed by Commerce that, consistent with the APOD's strategic direction, could have generated tangible increases in production—dollars Commerce saw as "decisive."  He simply ignored those proposals and instead moved forward with drilling the Erato Well over Commerce's objection.

159.    Indeed, after Commerce indicated that it would not fund any additional monies to Whistler, Frankel had no further use for Whistler's equity owners and he shifted his loyalty to his

lender, Apollo.  Frankel's decision to drill the Erato Well in November 2015 was heavily influenced by Apollo, which, as a secured lender, had the incentive to increase the value of its collateral through Whistler's potential realization of additional reserves that could be booked once the Erato Well was completed.  Frankel failed to separate Whistler's interest from Apollo's, and thus adopted Apollo's preferred strategy—drill the Erato Well as quickly as possible—as Whistler's.

160.    Frankel's decision to plow forward with drilling the Erato Well was thus tainted by a knowing and/or reckless lack of considered analysis, including, but not limited to, his failures to consider Whistler's lack of funding for the project or other projects that were consistent with the production-driven model established by the APOD, and also by his decision to adopt a strategy that elevated Apollo's desired outcome over what was best for Whistler, in breach of the duties of care and loyalty, respectively.

161.    Frankel was aware that his decision to proceed to the Erato Well posed a significant financial risk to Whistler, yet he chose to do so anyway, placing Whistler on the road to financial ruin.  Whistler sustained tens of millions of dollars of losses as a result of Frankel's decision to move on to the Erato Well.  The original authorization for expenditure for this Well was for $26 million, all of which (or more) Whistler paid, or incurred as a liability, before it was put into bankruptcy and the Erato Well was temporarily abandoned by setting a surface plug of cement.  Upon information and belief, the Erato Well also experienced cost overruns that are likewise reflected as liabilities owed by Whistler.  Every dollar Whistler spent, or owes, on account of the decision to drill the Erato Well is recoverable as damages herein.

162.    Moreover, if Frankel had not made the reckless and/or compromised decision to blindly follow his obsolete APOD and immediately drill the Erato Well as he did, Whistler would

33

not have been placed into bankruptcy and would have saved millions in administrative fees attendant to the bankruptcy.

163.    Frankel unilaterally made the decision to liquidate Whistler's in-the-money hedges in a futile effort to generate "sprinkle money" to pay down Whistler's trade creditors for their work on the Erato Well. Whistler's entire hedge book was unwound, sacrificing at least $17.3 million worth of value, and is recoverable as damages on account of Frankel's decision to drill the Erato Well. Whistler further lost five percent (5%) of the hedge book's value as a "transaction cost" based on the premature unwinding.

## Count II: Breach of Duties of Care and Loyalty: the Failed "Restructuring Transaction"

164.    The allegations in Paragraphs 1-163 are hereby incorporated by reference as if set forth in full herein.

165.    After work on the Erato Well was already in progress, Apollo indicated that it was interested in exploring an out-of-court "restructuring" transaction whereby it would provide Whistler with approximately $20 million of capital and, in turn, receive Commerce's supermajority equity interest in Whistler.

166.    Under Apollo's proposal, Commerce would retain some equity upside in the event Whistler's future value exceeded $125 million. Otherwise faced with the prospect of a total loss on its investment, Commerce, too, indicated that it was willing to explore the proposed restructuring.

167.    In March 2014, Commerce entered into an agreement to purchase Frankel's minority interest in Whistler. That agreement contemplated a final payment of $4.5 million due sometime in 2017, contingent upon Frankel's shares becoming vested pursuant to certain performance and production metrics. By November 2015, it was clear that those metrics would

not be met and that Frankel's shares would not vest, thus negating Commerce's obligation to pay Frankel the $4.5 million.

168.    However, Commerce was so anxious to be rid of Frankel and Whistler that it agreed to pay him $1.1 million as part of the contemplated restructuring agreement.  In exchange, Frankel agreed to "release" any claim to the $4.5 million payment ostensibly due in 2017.

169.    Because he personally stood to receive a $1.1 million personal payday in the event the restructuring transaction went through, Frankel failed to investigate other financing options that may have provided Whistler with an actual funding commitment toward the on-going Erato Well project.   Drilling thus continued for weeks while the parties negotiated the proposed restructuring transaction.

170.    On December 29, 2015, the parties signed documents memorializing the terms described above, including Apollo's obligation to provide $19.6 million in funding to Whistler, which was in desperate need of cash.

171.    When the small oil sheen appeared in the water near the Whistler platform, Apollo opted to "hold" its funding in abeyance until some undetermined later date.

172.    Frankel sought a legal opinion from Whistler's attorney, Mike Grove, as to whether Apollo was obligated to provide the funding.  Mr. Grove concluded that Apollo was required to fund the transaction immediately.

173.    Frankel knew that Whistler's accounts payable were significantly overdue and that vendors were threatening action.  Notwithstanding the opinion letter from Whistler's counsel, Frankel inexplicably, in the face of a known duty to act and in conscious disregard for his responsibilities as Whistler's CEO and control person, failed even to attempt compel payment from Apollo.

174.    To the contrary, at the end of January 2016, Frankel advised Apollo that he would not pursue the matter further.

175.    Although Frankel had no problem leaving $19.6 million of Apollo's money due to Whistler on the table, as a final act of self-interest, he nonetheless sought, and ultimately extracted, from Commerce the $1.1 million payment he had been promised as part of the failed restructuring transaction.  That payment was a *quid pro quo* in exchange for Frankel's agreement to avoid legal action over his termination.  That $1.1 million payment was an improper benefit that Frankel received for being on both sides of the restructuring transaction, in breach of his duty of loyalty to Whistler.

176.    Frankel's failure to take any steps to obtain the $19.6 million committed by Apollo constitutes a breach of his duties of care and loyalty.  Whistler was damaged by these breaches, as the promised payment—money that Frankel believed Whistler was entitled to and that he knew Whistler desperately needed—was money Whistler never received and that could have been used to pay Whistler's trade creditors, and perhaps allow the Erato Well to be completed and put into production.

**WHEREFORE**, H. Kenneth Lefoldt, Litigation Trustee for the Whistler Energy, II LLC Litigation Trust, respectfully prays for judgment against the Defendant Scott A. Frankel as follows:

1.  Awarding Plaintiff all damages proximately caused by each of the Defendant's breaches, errors, and/or omissions asserted herein in an amount to be proven at trial;

2.  Awarding Plaintiff punitive, exemplary and additional damages as a result of Defendant's activities complained of herein in an amount to be determined by the finder of facts;

3.  Awarding Plaintiff interest, costs, and attorney's fees;

4.  Awarding Plaintiff such other and further relief as the Court deems just and proper.

Dated: May 24, 2018

**LUGENBUHL, WHEATON, PECK, RANKIN & HUBBARD**

STEWART F. PECK (LA #10403)
MEREDITH S. GRABILL (LA #35484)
DANIEL CENTNER (LA #33055)
601 Poydras Street, Suite 2775
New Orleans, LA 70130
Telephone: (504) 568-1990
Facsimile: (504) 310-9195
Email: speck@lawla.com, mgrabill@lawla.com;
dcentner@lawla.com

*Attorneys for Trustee H. Kenneth Lefoldt*

37